# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEE A. S.,<br><br>             Plaintiff,<br><br>      v.<br><br>KILOLO KIJAKAZI,[1]<br>Acting Commissioner of Social Security,<br>             Defendant. | Case No.  ED CV 20-1643-RAO<br><br>**MEMORANDUM OPINION AND ORDER** |

## I.  INTRODUCTION

Plaintiff Lee A. S.[2] ("Plaintiff") challenges the Commissioner's denial of his application for disability insurance benefits ("DIB").  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

///

///

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi, the Acting Commissioner of Social Security, is hereby substituted as the defendant.

[2] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

## II. SUMMARY OF PROCEEDINGS

On April 5, 2017, Plaintiff filed a Title II application for DIB alleging that he had been disabled since May 6, 2016, due to PTSD, essential hypertension, neck fusion, occipital neuralgia, umbilical hernia, ulnar neuropathy at elbow, shoulder surgery, and heart problems. (Administrative Record ("AR") 13, 160-61, 183.) His claims were denied initially on August 25, 2017, and upon reconsideration on October 20, 2017. (AR 48-85.) On November 30, 2017, Plaintiff filed a written request for hearing, and a hearing was held on July 25, 2019. (AR 31-47, 100-01.) Plaintiff, represented by counsel, appeared and testified, along with an impartial vocational expert. (AR 31-47.) On September 18, 2019, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act,[3] from May 6, 2016, through the date of the decision. (AR 26.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (AR 1-6.) Plaintiff filed this action on August 14, 2020. (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act. *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 6, 2016, the alleged onset date. (AR 15.) At **step two**, the ALJ found that Plaintiff has the severe impairments of status-post left total knee replacement; chronic pain; hypertension; migraine headaches; lumbar spine degenerative disc disease; cervical spine degenerative disc disease, status-post fusion; anxiety; depression; and posttraumatic stress disorder (PTSD). (AR 15.) At **step three**, the ALJ found that Plaintiff "does not have an impairment or combination

---

[3] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).

2

of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 16.)

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except he can frequently climb ladders, ropes, scaffolds, ramps, and stairs; frequently balance, stoop, kneel, crouch, or crawl; understand, remember, and carry out simple, routine work tasks but not at a production rate pace, for example, no assembly line jobs; tolerate no more than occasional workplace changes; and occasionally interact with coworkers, supervisors, and the public. (AR 17-18.) At **step four**, the ALJ found that Plaintiff is unable to perform any past relevant work. (AR 25.) At **step five**, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 25.) Accordingly, the ALJ found that Plaintiff "has not been under a disability . . . from May 6, 2016, through the date of this decision." (AR 26.)

### III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. A court must affirm an ALJ's findings of fact if they are supported by substantial evidence, and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001). "Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, —U.S. —, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotations omitted). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see also Robbins v. Social Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."). The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart,* 340 F.3d 871, 874 (9th Cir. 2003)).

## IV. DISCUSSION

Plaintiff contends that the ALJ (1) impermissibly rejected his subjective symptom testimony; and (2) failed to adequately reject the lay witness testimonial evidence. (Joint Submission ("JS") at 5-18, 23-27.) For the reasons below, the Court affirms.

### A. The ALJ Gave Specific, Clear and Convincing Reasons for Discounting Plaintiff's Subjective Symptom Testimony

#### 1. Applicable Legal Standards

Where, as here, the claimant has presented evidence of an underlying impairment and the ALJ did not make a finding of malingering (*see* AR 19), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit [his or her] . . . ability to perform work-related activities." Soc. Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, at *4. In assessing the intensity and persistence of symptoms, the ALJ

4

"examine[s] the entire case record, including the objective medical evidence; an individual's statements . . . ; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *4. The ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's statements. *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations and internal quotation marks omitted); *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (citation omitted). The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 2. Background

In a Function Report dated May 17, 2017, Plaintiff stated that he is unable to be around people and large crowds, cannot lift anything over 20 pounds, cannot stand for long periods, cannot walk for long periods, and cannot climb ladders. (AR 204.) Stairs are a "problem." (AR 204.) His medication makes him drowsy, nauseated, and constipated. (AR 204, 211.) His daily activities consist of taking a shower, taking medication, feeding animals, watching television, reading, checking emails, eating, napping, and going to bed and waking up three to five times during the night due to pain, spasms, nightmares, and sweat. (AR 205.) He feeds his pets. (AR 205.) He has no problem with personal care. (AR 205.) His wife prepares his meals. (AR 206.) His household chores consist of rinsing off dishes for five minutes every day. (AR 206.) He does not do more chores because he is unable to bend over. (AR 207.) He can drive a car and can go out alone. (AR 207.) He shops for food and medication in stores two to three times per week for 30-45 minutes. (AR 207.) He spends time with others by calling friends and going to AA meetings at least three to five times per week. (AR 208.) His pain makes him snap at people and he has become withdrawn from almost all social activities. (AR 209.) He can lift 15-20 pounds, stand for 20-30 minute periods, and walk one block before needing to rest for three

to five minutes. (AR 209.) His pain and PTSD make it hard to concentrate. (AR 211.) In a Headache Questionnaire on the same date, Plaintiff reported daily severe headaches (migraines and occipital neuralgia) since 2008, which last 25 minutes to five hours per day. (AR 194.) He sometimes has multiple episodes per day, and he cannot resume normal activities until 30-60 minutes after each episode. (AR 194.)

Plaintiff described similar limitations in a Function Report dated October 4, 2017, except he stated that he could only lift five pounds; could stand, walk, sit, kneel for 10-15 minutes; could be around others for 15-30 minutes; could walk half to one block before needing to rest for three to five minutes; and his medication made him drowsy, nauseated, dizzy, and lightheaded, and also gave him headaches and a rash. (AR 239-47.)

At the hearing on July 25, 2019, Plaintiff testified that he stopped working in 2016 due to an injury and necrosis in the left knee, which led to left knee replacement surgery. (AR 35.) His left knee is "not what it used to be." (AR 35.) He is able to walk independently, but uses a "wall or whatever is around" to keep his balance. (AR 35, 38.) He looked for work after his knee surgery, but he could not find jobs he could do due to his "headaches and everything . . . and with all the medication that I'm on." (AR 36.) He experiences pain every day, mostly in his fused neck and lower back, and he also has chronic migraines. (AR 36-37.) His treatment has consisted of a neck fusion, Botox, physical therapy, TENS unit, and pain medication, including Tramadol, Lidocaine patches, Hydrocodone, Voltaren, and Topamax. (AR 37.) The medication helps with the pain, but makes him "like a slug." (AR 37.) His pain is usually six to ten with medication. (AR 37.) He can stand for 30 to 45 minutes at a time, walk for ten to 15 minutes, and sit for ten to 15 minutes. (AR 38.) On an average day, he spends 14 hours lying down. (AR 38-39.) He has a hard time lifting a gallon of milk. (AR 39.) He can climb stairs with the rails. (AR 39.) He can bend over, but it hurts. (AR 39.) He cannot kneel down. (AR 39.) His medication makes him sluggish and sweaty. (AR 39.) He sees a doctor at least once a month and a

mental health therapist once a month. (AR 39-40.) He suffers from PTSD and depression, and does not like large crowds and people. (AR 40.) He does not take any psychiatric medication or see a psychiatrist. (AR 40.) He does not do any chores around the house, and he very rarely drives. (AR 40-41.) He drives to an AA meeting once or twice a week. (AR 41.) He is independent in his personal care. (AR 41.)

### 3. The ALJ's Decision

The ALJ considered Plaintiff's subjective complaints. (AR 18-19.) The ALJ found that Plaintiff's statements about the intensity, persistence and limiting effects of Plaintiff's symptoms were not entirely consistent with the medical evidence and other evidence in the record. (AR 19.) Specifically, the ALJ discounted Plaintiff's subjective complaints for three reasons: (1) Plaintiff received routine, conservative, and non-emergency treatment; (2) Plaintiff's pain was well-managed with medication; and (3) Plaintiff's subjective complaints were inconsistent with the objective medical evidence.[4] (AR 19-24.)

### 4. Discussion

#### a. Reason No. 1: Inconsistencies Between Plaintiff's Statements and the Objective Medical Evidence

The ALJ found that Plaintiff's subjective statements were inconsistent with the medical evidence and other evidence in the record. (AR 19.) The lack of supporting objective medical evidence cannot form the sole basis for discounting testimony, but is a factor the ALJ may consider in making a credibility determination. *Burch*, 400 F.3d at 681; *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

---

[4] The Commissioner argues that the ALJ also relied on evidence that Plaintiff intentionally put forth poor effort during a consultative examination in an apparent effort to exaggerate his symptoms. (JS at 21; AR 20.) The ALJ noted such evidence when discussing the consultative examiner's opinion, but did not appear to discount Plaintiff's subjective testimony on that ground. (AR 20.)

Plaintiff argues that the ALJ erred in rejecting his subjective testimony on the ground that it was inconsistent with the objective medical evidence. (JS at 9.) He argues that this reason in and of itself is insufficient to reject his testimony, and he argues that the ALJ failed to connect any of his testimony to her analysis. (JS at 9-10.) The Court disagrees.

First, the ALJ did not rely solely on inconsistency with the objective medical evidence to discount his subjective testimony. The ALJ also discounted his testimony because he received routine, conservative and non-emergency treatment and because his conditions were well-managed. (AR 19-24.) As discussed below, the ALJ was entitled to rely on Plaintiff's well-managed conditions to discount his subjective testimony. Therefore, the ALJ did not rely solely on inconsistency with the objective medical evidence to discount his subjective testimony.

Second, the ALJ detailed which parts of the record contradicted or undermined Plaintiff's testimony regarding his limitations. The ALJ found that Plaintiff's diagnostic studies showed no evidence of neurological deficits that would limit him to the extent alleged, and the physical examination findings were generally mild in light of Plaintiff's subjective complaints. (AR 23.) The ALJ further found that Plaintiff rarely mentioned his knee pain after undergoing total knee replacement surgery, there was no evidence of atrophy due to lack of use, no evidence of neurological deficits or gait abnormalities due to his knee pain or low back pain, and he acknowledged that he did not need an assistive device for ambulation. (AR 23.) The ALJ also found that although Plaintiff alleged various side effects from his medications, the medical records did not corroborate those allegations. (AR 23.)

The ALJ's findings are supported by substantial evidence. For example, the ALJ noted that post-left total knee replacement, physical examinations of Plaintiff's left knee showed no evidence of atrophy in the knee; normal symmetry; no temperature changes; tenderness to palpitation of the inferior/superior pole of the patella, but no midline tenderness; limited extension and flexion secondary to mild

stiffness, pain and discomfort; intact cranial nerves II-XII; intact motor strength in the upper and lower extremities; and intact sensation. (AR 20, 580.)

In April 2017, an x-ray of Plaintiff's left knee showed no definite acute osseous abnormality, and findings from a physical examination showed no motor or sensory deficits in the upper extremities; good range of motion of the cervical spine with mild tenderness; and positive straight leg raising. (AR 20, 650, 682-83.) Plaintiff's left knee was noted to be doing well, and Plaintiff's neck was noted to be better with only minimal discomfort. (AR 20, 735-36.) In May 2017, an MRI of the lumbar spine showed overall mild multilevel degenerative changes of the lumbar spine with no high-grade central canal or neural foraminal stenosis seen. (AR 20, 685-86.) In June 2017, despite Plaintiff's reports of chronic knee pain and ongoing neck pain, a physical examination showed tenderness to palpitation of the paraspinal muscles from C5-7 bilaterally, as well as mild crepitus in the left knee with limited flexion and extension secondary to stiffness and pain, but there was no evidence of atrophy, Spurling's test was negative, motor strength was 5/5 throughout, and sensation was intact. (AR 20, 749-50.)

At an August 2017 consultative orthopedic evaluation, during which the examiner noted that Plaintiff did not put forth maximum effort on the examination, a physical examination showed that Plaintiff was in no acute distress; he was able to get up from a chair and examination table without difficulty and without an assistive device, his gait was slow but normal, range of motion of the cervical spine and lumbar spine was decreased but without pain in the back, straight leg raising was negative bilaterally, strength was grossly within normal limits, sensation was intact in the upper and lower extremities, and reflexes were hypoactive. (AR 20, 707-09.) In October 2017, a physical examination showed normal range of motion of the musculoskeletal system despite Plaintiff's complaints of uncontrolled lumbar pain and cervical pain that had been waxing and waning. (AR 21, 816-17.) An MRI of the cervical spine conducted in October 2018 showed degenerative and postoperative

changes of mild narrowing of the spinal canal diameter at multiple levels, multilevel severe neuroforaminal narrowing, and indication of possible missing surgical screws, but Plaintiff was found not to be a candidate for fusion or decompression surgery in part because his subjective complaints outweighed the objective findings. (AR 21, 1069-70, 1116, 1167.) A January 2019 physical examination showed tenderness and spasm in the lumbar and cervical spine, but range of motion remained normal and there were no neurological deficits. (AR 21, 1068.) The ALJ noted that Plaintiff treated with medial branch blocks, lumbar epidural injections, and pain management, but Plaintiff reported relief with pain medication with no side effects. (AR 21-22, 690, 966-67, 1167.)

Regarding Plaintiff's mental health treatment, the ALJ noted that Plaintiff's mental status examinations were generally unremarkable. (AR 22, 703-04, 935, 949, 964, 1006.) Plaintiff received periodic therapy for PTSD and generalized anxiety disorder in 2017 and 2018, but he was not referred to a mental health specialist even when he demonstrated increased symptoms. (AR 22, 713-20, 792-807.) He was also not prescribed psychotropic medication. (AR 23.)

Regarding Plaintiff's alleged chronic migraines, the ALJ noted that there was minimal mention of this condition throughout the record, and Plaintiff was treated conservatively for this condition. (AR 23.)

Despite Plaintiff's arguments to the contrary, the Court finds that the ALJ sufficiently connected Plaintiff's testimony to her analysis. The ALJ carefully evaluated the medical record and identified the evidence that supported Plaintiff's allegations of limitation as well as the evidence that was inconsistent with or otherwise undermined her statements, as provided by SSR 16-3p. Her findings are supported by substantial evidence and will not be disturbed. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("If the ALJ's [credibility] finding is supported by substantial evidence, the court may not engage in second-guessing.") (quotation omitted). Even if Plaintiff had offered a different interpretation of the

evidence, which she has not, the Court finds that the ALJ rationally interpreted the objective medical evidence and, therefore, defers to the ALJ's conclusion. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004); *see also Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020).

### b. Reason No. 2: Routine, Conservative, Non-Emergency Treatment

An ALJ may discount a claimant's testimony based on routine and conservative treatment. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting a plaintiff's complaint "that she experienced pain approaching the highest level imaginable" as "inconsistent with the 'minimal, conservative treatment' that she received").

The ALJ observed that Plaintiff received routine, conservative, and non-emergency treatment since the alleged onset date. (AR 19.) The ALJ discussed the treatment Plaintiff received regarding his neck, left knee, and back pain in detail. (AR 19-24.) The ALJ noted that Plaintiff had a left knee replacement due to osteonecrosis in September 2016 after falling from a ladder. (AR 19-20.) After surgery, Plaintiff was treated with narcotic pain medications and physical therapy and advised to engage in a home exercise program and daily stretching, along with use of heat and ice and over-the-counter medication. (AR 20, 524, 581.) The ALJ noted that throughout 2018 and 2019, Plaintiff rarely mentioned his knee pain post-surgery, and there was no indication of a further need for surgical intervention. (AR 23.) The ALJ noted that Plaintiff was treated with narcotic pain medications, over-the-counter Ibuprofen and Tylenol, and a TENS unit for his neck and back pain. (AR 20, 751.) Plaintiff was unsuccessfully treated with medial branch blocks and a lumbar epidural steroid injection, but he was determined not to be a candidate for fusion or decompression surgery and he declined further treatment with injections.

(AR 21, 676, 680, 1116, 1224.) The ALJ noted that Plaintiff did not need an assistive device for ambulation. (AR 23.) The ALJ found that overall, Plaintiff's conditions were managed with pain medications and with no recommendations for further surgery. (AR 19-24.)

The Court is not convinced that Plaintiff's treatment was routine or conservative, given the hundreds of pages of treatment records regarding Plaintiff's neck and back pain, indicating ongoing and consistent treatment, including medial branch blocks and a lumbar epidural steroid injection, a TENS unit, narcotic pain medication, and referrals to pain management and specialists for surgical options.[5] (*see, e.g.,* AR 648-1224.) *See Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) (treatment consisting of "copious" amounts of narcotics, occipital nerve blocks, and trigger point injections is not conservative); *Ruiz v. Colvin*, 2016 WL 471208, at *6 (C.D. Cal. Feb. 5, 2016) (finding that treatment was not conservative when it consisted of taking Tramadol for pain, physical therapy, and a referral to an orthopedist for surgical options); *Shepard v. Colvin*, 2015 WL 9490094, at *7 (E.D. Cal. Dec. 30, 2015) (finding that a record that reflected "substantial medical treatment and heavy reliance on pain medication," including narcotics, did not support a finding that treatment was conservative). The ALJ failed to explain why Plaintiff's course of treatment, including his ongoing use of narcotic pain medication, was conservative or conflicted with his subjective testimony. *See Childress v. Colvin,* 2014 WL 4629593, at *12 (N.D. Cal. Sept. 16, 2014) ("It is not obvious whether the consistent use of such a narcotic (for several years) is 'conservative' or in conflict with Plaintiff's pain testimony, and therefore requires further explanation.").

---

[5] The Commissioner argues that "the ALJ properly considered that the treatment records reveal that Plaintiff engaged in primarily routine, conservative, and non-emergency treatment," citing the Regulations, but does not argue that Plaintiff's treatment was routine or conservative. (JS at 20.)

12

Substantial evidence does, however, support the ALJ's determination that Plaintiff's treatment was conservative with respect to his mental health and migraines. Regarding Plaintiff's mental health symptoms, the ALJ noted that Plaintiff was seeing a therapist, but was not taking any psychotropic medications or receiving psychiatric treatment. (AR 22.) *Cf. Delores A. v. Berryhill,* 2019 WL 1330314, at *6 (C.D. Cal. Mar. 25, 2019) (finding treatment not conservative when plaintiff attended monthly psychiatric sessions and took psychotropic medications). Plaintiff received inconsistent therapy for PTSD and generalized anxiety disorder in 2017 and 2018, but despite a lack of consistent treatment, his mental status examinations conducted during visits for his physical conditions were generally normal.[6] (AR 22-23, 713-20, 791-807, 935, 949, 964, 1006.) Even when Plaintiff's mood was noted to be anxious and his affect was angry, labile, and inappropriate, his speech was rapid and pressured, he was aggressive, his thought content was paranoid, and he expressed impulsivity, Plaintiff was not referred to a psychiatrist. (AR 22, 1083.) Regarding Plaintiff's migraines, the ALJ noted that there is minimal mention in the record of this condition, which did not appear to start until mid-2018. (AR 23.) Plaintiff was treated conservatively for this condition, and there is little evidence of further treatment. (AR 23, 314, 352, 769.)

Based on the record as a whole, the Court finds that this reason is not a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's subjective testimony regarding his neck and back conditions.

///

///

---

[6] The therapy notes generally appear to contain Plaintiff's self-reported symptoms with no indication of mental status examinations. (AR 22, 713-20, 791-807.) Plaintiff's therapist found marked restrictions in activities of daily living, extreme difficulties in maintaining social functioning, constant deficiencies of concentration, persistence or pace, and continual episodes of deterioration or decompensation, but did not refer Plaintiff to a psychiatrist for medication or treatment. (AR 213, 803.)

### c. *Reason No. 3: Well-Managed Pain*

Generally, "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ found that Plaintiff appeared to be well-managed with pain medications. (AR 23.) The ALJ noted that Plaintiff rarely mentioned his knee pain after undergoing total knee replacement surgery, indicating good response to this course of treatment. (AR 23.) The ALJ also noted that Plaintiff's alleged medication side effects were not corroborated by the record. (AR 23.) In addition, Plaintiff's migraines required minimal treatment. (AR 23.)

Substantial evidence supports the ALJ's finding as to Plaintiff's knee pain being well-managed after his left knee replacement in September 2016. (AR 487.) By November 2016, Plaintiff reported that his left knee was doing well and his pain was much better. (AR 555.) A physical examination and x-ray of the left knee showed excellent range of motion and stable left knee, and Plaintiff was noted to be "much better." (AR 556, 681.) In April 2017, Plaintiff reported that his left knee was slowly getting better with minimal discomfort, and his major complaint was low back pain. (AR 648, 682, 735.) Subsequent treatment records did not focus on knee pain. (AR 760, 1071, 1110, 1132, 1157.)

Substantial evidence supports the ALJ's finding that Plaintiff's migraines appeared to require little treatment, indicating either improvement in this condition or good pain control. (AR 23.) Plaintiff was treated with Topamax and Gabapentin, which were noted to minimize or eradicate his migraines. (AR 314, 352.) The ALJ could reasonably find that Plaintiff's migraines were well-controlled.

Substantial evidence supports the ALJ's findings regarding Plaintiff's allegations regarding his neck and back pain. The record indicates that Plaintiff had a good response with Norco, and to some extent Tramadol, without side effects. (AR 629, 690, 695, 748, 770, 829, 907, 917, 946, 961, 967, 1042.) Plaintiff's doctors

noted that Plaintiff was doing well on Norco, which assisted Plaintiff with functionality. (AR 770, 967, 1007, 1046, 1084.) Although Plaintiff was treated by a pain clinic (AR 618, 629, 1169-70), a lumbar medial branch nerve block (AR 676, 1226-27), a caudal epidural steroid injection (AR 1007, 1227-28), and a TENS unit (AR 666), surgical interventions were not recommended (AR 1080). The ALJ noted that Plaintiff did not need an assistive device for ambulation. (AR 23.)

Plaintiff argues that whatever relief he may have had was "irrelevant when reading the record as a whole," given that he continues to suffer chronic pain. (JS at 13-14.) The Court finds that the ALJ's finding that Plaintiff's pain was well-managed was a rational interpretation of the evidence. The Court must, therefore, defer to the ALJ's conclusion. *See Batson*, 359 F.3d at 1198; *see also Ford*, 950 F.3d at 1156 ("The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation.") (citation and internal quotation marks omitted).

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's subjective testimony.

### 5. Conclusion

In sum, two out of the three reasons cited by the ALJ are supported by the record. The Court finds that these reasons are sufficient to uphold the ALJ's finding regarding Plaintiff's subjective testimony. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (holding error is harmless if substantial evidence remains to support the ALJ's credibility finding).

### B. The ALJ Did Not Err in Rejecting the Third Party Testimony

Plaintiff contends that the ALJ failed to articulate legally sufficient rationale to reject the lay testimonial evidence from Plaintiff's wife, Annette S. (JS at 23-26.) Specifically, Plaintiff argues that the ALJ simply states that his wife's opinion is not sworn and is a parrot of Plaintiff's testimony, which are not legitimate reasons

for rejecting her testimony.[7] (JS at 25.) Plaintiff does not argue that his wife's testimony was not substantially similar to Plaintiff's testimony. (JS at 23.)

When rejecting lay witness testimony, an ALJ "must give reasons that are germane to each witness." *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (citation omitted). Here, the ALJ stated that she had read and considered the May 2017 and August 2017 Third Party Function Reports completed by Plaintiff's wife, which were largely consistent with Plaintiff's subjective testimony. (AR 19, 196-203, 230-37.) The ALJ found that her statements had not been given under oath; and the statements "appear[ed] to be no more than a parroting" of Plaintiff's subjective testimony. (AR 19.) The ALJ did not explicitly reject Plaintiff's wife's statements, but it was clear that the ALJ did so along with Plaintiff's subjective testimony for being not entirely consistent with the medical evidence and other evidence in the record. (AR 19.) Any error, however, is harmless.

An ALJ may reject lay testimony that mirrors a plaintiff's testimony where, as here, the plaintiff's testimony was properly rejected. *See Valentine*, 574 F.3d at 694 (finding where ALJ's reasons for rejecting plaintiff's own subjective testimony were clear and convincing, the ALJ's rejection of lay witness testimony, based in part on the same reasons for discounting plaintiff's own allegations, constituted "germane reasons" for rejecting lay witness testimony). As discussed above, the ALJ gave clear and convincing reasons for rejecting Plaintiff's subjective testimony, so the ALJ may rely on those same reasons for rejecting his wife's testimony.[8]

---

[7] Plaintiff also argues that the ALJ "does not offer any sufficient rationale to disregard [Plaintiff's] brother's and best friend's descriptions of [Plaintiff's] limited functional ability. (JS at 24.) The Court does not know to what evidence Plaintiff refers, as the record does not appear to contain lay testimony from Plaintiff's brother and best friend. The Commissioner does not address such evidence either.

[8] To the extent the ALJ discounted the lay witness testimony because it was not given under oath, that is not a germane reason. "[T]here is no requirement that a third-party function report be administered under oath." *Kelli C. S. v. Berryhill*, 2019 WL 1330890, *5 (C.D. Cal. Mar. 25, 2019) (citing *Valenzuela v. Berryhill*, 2018 WL 1524496, at *13 (S.D. Cal. Mar. 28, 2018) ("an ALJ cannot disregard a lay witness's

Accordingly, remand is not warranted on this issue.

## V. CONCLUSION

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: September 8, 2021

_____
ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**

---

testimony simply because it was not provided under oath"). Plaintiff's wife provided her statements on the Agency's own form, and there was no requirement on the form that the statements be provided under oath. *See Stewart v. Astrue*, 2012 WL 487467, at *6 (C.D. Cal. Feb. 15, 2012) (finding ALJ improperly discounted third party statements on the Agency's own Third Party Function Report form because they "were not given under oath").

17